**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Paul Bobrowski, | ) | No. CV 09-02077-PHX-FJM |
| Plaintiff, | ) | **ORDER** |
| vs. | ) | |
| Red Door Group, et. al., | ) | |
| Defendants. | ) | |

The court has before it plaintiff's motion for partial summary judgment (docs. 77, 78), defendants' response (docs. 87, 88), and plaintiff's reply (docs. 96, 97). We also have before us defendants' motion for summary judgment (docs. 84, 85), plaintiff's response (docs. 90, 92, 93), and defendants' reply (docs. 96, 97).

**I. Background**

In late 2007 plaintiff was looking for investment opportunities and came upon an advertisement for a real estate investment opportunity in Arizona called the Owner Share Advantage Program. The company advertising the program was Red Door Group.[1] Under the program plaintiff could purchase condominium units from an affiliate of Red Door Group called New GrayBriar Condominium, LLC ("NG") and enter into an Asset Management

---

[1] Red Door Group is an Arizona corporation and single member of defendant Red Door Realty Advisors, LLC.

1  Agreement ("AMA") under which he leased the property back to NG and NG would
2  renovate, manage, and sell the property and pay plaintiff a fixed monthly rental payment and
3  a fixed purchase price upon the sale of any units. The AMA also gave NG the option to
4  repurchase the units at any time during the term of the lease.

5  Plaintiff purchased eight units under the Owner Share Advantage Investment Program.
6  The transaction closed on October 2, 2008. Plaintiff was represented by his own real estate
7  agent, who is not a party to this action. In November 2008, defendants Earl Ricker and
8  Robert Porter, the sole officers, directors, and shareholders for Right Place Redevelopment,
9  the parent company of NG, and Red Door Group, decided to shut down operations.[2]
10 Throughout November and December of 2008, non-party Right Place Properties[3] notified
11 investors, including plaintiff, that lease payments were being suspended. Around November
12 20, 2008, Red Door Group cancelled all pending escrows, which involved $8-10 million of
13 transactions. The only lease payment plaintiff ever received was on November 1, 2008.
14 Plaintiff regained possession of the units in January 2009 after terminating the AMA. No
15 renovations were ever made.

16 Plaintiff asserts this action against numerous entity and individual defendants.
17 Plaintiff alleges claims for federal and state securities violations, fraud, money had and
18 received, breach of lease, and federal RICO violations. Plaintiff moves for partial summary
19 judgment that 1) Red Door Group and Darla Lopatenko, the salesperson for Red Door Group,
20 used interstate communication to offer and sell an unregistered security to plaintiff; 2) Porter,

---

[2] Ricker and Porter were also directors and officers of Right Place Asset Management, another defendant in this action. Defendants Kevin Peck and Andrew Grunwald were the other officers and directors of Red Door Group.

[3] Right Place Properties operated an affordable housing business in which it marketed condominiums. Each of the condominium complexes was owned by a separate limited liability company. In this case, the condominium complex in which plaintiff purchased units was owned by NG. Moreover, each of the condominium LLCs had a single member, either Right Place Redevelopment or Right Place Asset Management. Right Place Redevelopment was the single member parent company for NG (doc. 85 ¶¶ 30-34).

Ricker, and Peck are liable as "controlling persons" of Red Door Group in connection with the sale of unregistered securities; and 3) the AMA was breached when payments were not made to plaintiff on December 1, 2008 and thereafter. Alternatively, defendants seek summary judgment on each one of plaintiff's claims, against all defendants, except NG on the breach of lease claim.

## II. Plaintiff's Claims

### A. Federal and State Securities Violations

Both parties move for summary judgment on plaintiff's securities claims. In counts one and two, plaintiff alleges that the Purchase Agreement coupled with the AMA constituted an offer and sale of unregistered securities in violation of federal securities laws, 15 U.S.C. § 77a, et. seq. and 15 U.S.C. § 78a, et. seq, and Arizona securities laws, A.R.S. § 44-1841.

An "investment contract" is a type of security. 15 U.S.C. §§ 77b(a)(1), 78c(a)(10); S.E.C. v. Edwards, 540 U.S. 389, 393, 124 S.Ct. 892, 896 (2004). In SEC v. W.J. Howey Co., 328 U.S. 293, 301, 66 S.Ct. 1100, 1104 (1946), the Supreme Court held that an "investment contract" is a "security" if a person: (1) invests money; (2) in a common enterprise; and (3) is led to expect profits solely from the efforts of the promoter or a third party. Arizona applies the same test. Nutek Info. Sys. v. Ariz. Corp. Comm'n., 194 Ariz. 104, 108, 977 P.2d 826, 830 (Ct. App. 1998), cert denied. AKS Daks Comm. Inc. v. Ariz. Corps. Comm'n., 528 U.S. 932, 120 S.Ct. 332 (1999).[4] We apply this test in light of the economic realities of the transaction rather than the labels imposed by the parties. Edwards, 540 U.S. at 393, 124 S.Ct. at 896. Whether a certain transaction is a security is a question of law. United States v. Carman, 577 F.2d 556, 562 (9th Cir. 1978).

Here, the parties do not dispute that plaintiff made an investment and that he was led to expect profits substantially from defendants' efforts. The only issue is whether the parties

---

[4] Because the test for analyzing plaintiff's federal and state securities claims is the same, our analysis applies to both counts one and two.

engaged in a common enterprise. A common enterprise exists if there is vertical or horizontal commonality. SEC v. R.G. Reynolds Ent., Inc., 952 F.2d 1125, 1130 (9th Cir. 1991). Horizontal commonality occurs where investors pool their assets and "give up any claim to profits or losses attributable to their particular investments in return for a pro rata share of the profits of the enterprise." Hocking v. Dubois, 885 F.2d 1449, 1459 (9th Cir. 1989). Vertical commonality is "an enterprise common to an investor and seller, promoter, or some third party" and can be shown when "the fortunes of the investors are linked with those of the promoters." R.G. Reynolds, 952 F.2d at 1130.

Although there is no express pooling arrangement, plaintiff contends that there is horizontal commonality because NG was required to pay a fixed rent to plaintiff regardless of the success of any rental unit. The only way NG could fulfill that obligation, plaintiff asserts, would be to pool its profits from all the condominium units and pay individual investors. From this, plaintiff asks us to infer a pooling arrangement. Defendants argue that it is undisputed that plaintiff did not pool his money with any other investors. Plaintiff simply purchased an undivided share of the condominium complex, to which he was entitled to a fixed monthly rent and repurchase price for his units alone.

We conclude there is no horizontal commonality. Pursuant to the express terms of the Purchase Agreement, plaintiff purchased fee simple title to eight units and was entitled to a fixed monthly rent and set repurchase price for his units alone. Plaintiff did not purchase an undivided share in the total rentals or sales of all the units. Even looking beyond the contractual terms, the economic reality of the transaction did not involve plaintiff "giving up any claim to profits or losses attributable to [his] particular investments in return for a pro rata share of the profits of the enterprise." Hocking, 885 F.2d at 459. Plaintiff owned the individual units, and could make profits or sustain losses independent of the fortunes of other purchasers. How NG paid plaintiff each month is irrelevant.

Alternatively, plaintiff asserts that there is vertical commonality because his "fortunes," i.e., receiving payments from NG, were "interwoven and dependent upon the success" of defendants in managing, renting, or selling his units. SEC v. Glenn W. Turner

Enter., Inc., 474 F.2d 476, 482, n. 7 (9th Cir. 1973), cert. denied, 414 U.S. 821, 94 S.Ct. 117 (1973). Plaintiff claims that he was required to enter into the various AMAs, which granted "the exclusive rights to lease the units to NG and/or Right Place Redevelopment Company ("RPRC)." MPSJ at 6; doc. 78 ¶¶ 15-23. NG and RPRC[5] also received the exclusive right to sell the units for a period of five years and upon sale, plaintiff would receive a fixed purchase price, depending on when the unit was sold, and RPRC would keep the rest. Defendants argue that plaintiff was not required to enter into the AMA, but voluntarily chose to (doc. 88 ¶ 42). Furthermore, plaintiff and defendants' fortunes were not linked because plaintiff received fixed rental and sale returns, irrespective of market fluctuations or defendants' profits or losses.

We assume for the purposes of our analysis that plaintiff was required to enter into the AMA. Although the AMA was not specifically referred to in the Purchase Contract, the timing of the agreements[6] and the overall nature of the transaction demonstrate that they were sold to plaintiff as one package.

Whether vertical commonality exists is a close issue. Even viewing the evidence in the light most favorable to plaintiff, we find that plaintiff's investment fortunes were not directly linked to NG or RPRC's success and profitability. The AMA, with its fixed payment terms, entitled plaintiff to specific investment returns, not contingent on NG's efforts and not required to be shared with anyone else. Specifically, Section 3 "Lease" states that the Asset Manager has an "obligation to pay Monthly Rent and Additional Rent . . . should the Affordable Housing Buyer not make payments under the applicable agreement" (doc. 78, ex. H). By the express terms of the contract, plaintiff was entitled to be paid, whether or not the

---

[5] Plaintiff also executed Special Powers of Attorney appointing defendant Right Place Redevelopment Company as attorney-in-fact to operate, manage, and resell the Units. We also consider this as part of the overall transaction.

[6] The Purchase Agreement was signed July 23, 2008. The eight AMA's were not signed until August 21, 2008. However, this was before the closing and even before a purchase addendum, reducing the total number of units purchased, was entered into in September 2008. The entire transaction closed October 2, 2008.

units were successfully rented. We agree with the district court's reasoning in a factually similar case <u>Lavery v. Kearns</u>, 792 F.Supp. 847, 853 (D. Me. 1992), that because payment under the lease was "not conditioned upon successful rental of the units, and rental of the units beyond what is necessary to pay the lease amount results in greater revenue for [the promoter] only," there is no vertical commonality.[7] <u>See also</u> <u>Pliskin v. Bruno</u>, 838 F. Supp. 658, 662-63 (D. Me. 1993); <u>Elson v. Geiger</u>, 506 F.Supp. 238, 243 (E.D. Mich. 1980); <u>Salameh v. Tarsadia Hotels</u>, No. 09CV2739, 2011 WL 1044129 (S.D. Cal. March 22, 2011).

Plaintiff also argues that vertical commonality may be shown because his ability to profit from a sale, depended entirely on NG or RPRC's marketing efforts. Even upon sale, however, plaintiff was entitled to a fixed purchase price. Any money above or below that was born by NG. At the expiration of the lease NG only had the *option* to purchase the unit. Otherwise, plaintiff would regain full rental and leasing rights. Simply because plaintiff's ability to profit from a sale depended in part on NG or RPRC's ability to sell the unit does not satisfy the common enterprise element of the <u>Howey</u> test. It may satisfy the third element, namely that plaintiff's profits depended on the efforts of a third party, but that is not sufficient to prove the second element. "Every lessor, in some measure, is reliant upon his commercial lessee's ability to manage the business profitably; however such reliance will not render every commercial lease a security." <u>Lavery</u> 792 F. Supp. at 854-55. We deny plaintiff's motion for partial summary judgment and grant defendants' motion for summary judgment. Plaintiff's claims of securities violations fail as a matter of federal and state law. Accordingly, we also deny plaintiff's motion for partial summary judgment that Porter, Ricker, and Peck are liable as "controlling persons" in connection with the sale of a security. Absent the existence of a security, plaintiff's claims of "controlling person" liability fail as

---

[7]Plaintiff distinguishes <u>Lavery</u>, arguing that it was decided only after a bench trial and the investor could cancel the management agreement upon thirty days notice. Whether something is a security is a question of law, which we may properly decide on a motion for summary judgment. Moreover, the fact that plaintiff could not cancel the AMA, as was the case in <u>Lavery</u>, is not relevant to the question of whether a security was sold.

a matter of law.

**B. Fraud**

Plaintiff's third cause of action alleges that defendants fraudulently induced plaintiff to enter into the transaction and asks for rescission of the Purchase Agreement and AMAs. Plaintiff claims that defendants knew that the investment was not profitable and that the companies were experiencing financial hardship, yet they still fraudulently convinced him to purchase eight units only a month before the companies shut down. Defendants argue that plaintiff does not offer clear and convincing evidence of the nine elements of fraud and therefore we must grant summary judgment. The claim is stated against the defendants who actually made the alleged statements, Lopatenko and Amy Mirata (sales associates of Red Door Group), as well as against the other entity and individual defendants on theories of joint venture and alter ego liability. Because joint venture and alter ego allegations are forms of derivative liability arising from the underlying substantive cause of action, we address the substance of the fraud claim first. See generally Local 159 v. Nor-Cal Plumbing, Inc., 185 F.3d 978, 985 (9th Cir. 1999).

Defendants argue that none of the alleged false statements support a claim for fraud. First, plaintiff alleges that up until October 2008, defendants told him that he would receive a "guaranteed" monthly rent and that his units would be repurchased within 9-12 months. Defendants argue that these were simply promises of future contractual performance, and not actionable as fraud. Plaintiff, asserts that the close timing of the statements, October 2008, to the closing of the companies, November 2008, gives rise to an issue of material fact that defendants had the present intent not to perform when they made the statements.

Actionable fraud "cannot be predicated on unfulfilled promises, expressions of intention or statements concerning future events unless such were made with the present intention not to perform. Staheli v. Kauffman, 122 Ariz. 380, 383, 595 P.2d 172, 172 (1979); McAlister v. Citibank, 171 Ariz. 207, 215, 829 P.2d 1253, 1261 (Ct. App. 1992). Intent may not be proven by mere non-performance, otherwise, all breach of contract cases would constitute fraud. Id. Here, plaintiff's only evidence of intent, other than non-performance,

is the timing of the statements. Plaintiff cites two cases, applying California law, which allegedly support his claims. Those cases however, do not apply Arizona law and do not support plaintiff's arguments. For example, in Kaylor v. Crown Zellerbach, Inc., 643 F.2d 1362, 1368 (9th Cir. 1981), the Ninth Circuit upheld an order granting summary judgment on a fraud claim, finding that the defendant had initially performed in accordance with its promises, which "negate[d] any possible inference of fraud." Here, defendants paid plaintiff in November 2008. That initial payment negates an inference of fraud. Furthermore, pursuant to the contract, defendants only had the option, not the obligation, to repurchase the units. This expressly contradicts plaintiff's claims that defendants promised him they would re-purchase the property with in 9-12 months. The contract terms control. In essence, what plaintiff now views as a misrepresentation is really defendants' failure to fulfill its business obligations. That, however, does not make the statements fraudulent.

Next, plaintiff alleges that defendants told him that the Owner Share Advantage Program was "completely safe," "hassle-free" and a "turn-key investment," and that the entire transaction was a "risk-free." Complaint ¶¶ 22, 30. Defendants argue that those statements are merely expressions of opinion. In response, plaintiff, simply asserts that defendants were purporting to state facts about their business. Actionable fraud must be based upon a misrepresentation of material fact, and not upon an expression of opinion. Page Inv. Co. v. Staley, 105 Ariz. 562, 468 P.2d 589 (1970). On its face, the representations here are mere expressions of opinions or judgments about the quality of the investment and do not invalidate the contract. Even assuming such statements were made, it was ultimately plaintiff's decision to trust and rely on them. Plaintiff had every opportunity to investigate the accuracy of the statements and form his own judgment. Plaintiff even signed a Disclosure Affidavit which says that he had "knowledge and experience in financial real estate: and was capable of "evaluating the merits and risks of the real estate transaction" (doc. 85 ¶ 77). Absent any evidence that plaintiff was prevented from making an investigation of his own, we will not find fraud based upon such statements of opinion. See Singer v. Bank of Douglas, 82 Ariz. 329, 332-33, 313 P.2d 399, 402 (1957).

Finally, defendants argue that statements that, 1) the Red Door Group had $85 million in assets and the financial ability to withstand shortfalls in rent and 2) had a 17 year track record of no defaults, were not false statements when made. Moreover, defendant contends that plaintiff's allegations of reliance are undercut by facts indicating that plaintiff realized before the closing that the real estate market was declining. Plaintiff argues that the statements were false by omission because defendants failed to mention that they simultaneously had excess debts and that the Owner Share Advantage Program had been in existence for less than two years.

We agree with defendants that plaintiff fails to produce any evidence showing that the statements were false when made. Plaintiff does not claim that defendants ever represented that the Owner Share Advantage Program had a 17 year tract record. Plaintiff produces no evidence contradicting that the company as a whole had such a track record. With regard to the statements concerning the companies' assets, the only evidence plaintiff offers are facts that the companies also had excess liabilities. (doc. 93, ex. A ¶¶ 305-08); see also (doc. 93, ex. K at 203 (plaintiff's deposition testimony stating that the only basis he had to prove the statements were false were that defendants subsequently defaulted on his rent payments)). Even if that was a false omission, as plaintiff argues, defendants have produced significant evidence that plaintiff knew that the real estate market was declining and was aware of the risks of the investments. (doc. 85 ¶¶ 131, 134, 194-95). Given that plaintiff was aware of the risks, had his own real estate agent, and represented to defendants that he was capable of evaluating the transaction, he cannot now claim that he exclusively relied on Red Door Group employees Lopatenko and Mirata's representations. See Wilson v. Byrd, 79 Ariz. 302, 288 P.2d 1079 (1955) (granting summary judgment because plaintiff was not entitled to rely on the statements).

Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2252 (1986). Here, we conclude that plaintiff fails to provide sufficient

evidence to allow a fact-finder to find by clear and convincing evidence that defendants made any fraudulent statements. We grant defendants' motion for summary judgment on the fraud and rescission claim.

**C. Money Had and Received**

In count five,[8] plaintiff asserts a claim for money had and received or conversion. Plaintiff claims that he paid $844,967.81 to NG and that each of the defendants (other than Lopatenko or Mirata) received the sums or the benefits of the sums. Defendants argue that only NG received the money and only it can be liable.

A claim for money had and received may be maintained by evidence "showing that the defendant has received or obtained possession of money of the plaintiff which in equity and good conscience he ought to pay over to the plaintiff." Copper Belle Mining Co. v. Gleeson, 14 Ariz. 548, 551, 134 P. 285, 287 (1913). It is undisputed that plaintiff entered into the contract with NG and thus paid NG. With regard to all defendants except NG and Red Door Group[9] then, it is undisputed that they do not have possession of any funds. NG does not contest that it received plaintiff's down payment. However, defendants argue that the claim fails against NG because plaintiff acquired title to the units at the close of escrow and therefore got exactly what he bargained for. Because no genuine issue of material fact exists as to whether plaintiff received the benefit of the bargain in the transaction, we find that plaintiff is not entitled to the equitable remedy of money had and received.

**D. Breach of Lease**

Both plaintiff and defendants both move for summary judgment on the breach of lease claim. In count six, plaintiff asserts that Red Door Realty, NG, Right Place Redevelopment Company, Red Door Group and Right Place Asset Management breached the AMAs by failing to pay plaintiff the rent due under the agreement. Defendants admit that the AMA has

---

[8] Plaintiff voluntarily dismissed count four (doc. 50).

[9] Red Door Group received payments for fees from the transaction and therefore did receive some benefit from the sums plaintiff paid.

- 10 -

1  been breached, but argue that only NG can be liable as only it was party to the AMA.
2  Plaintiff contends that the other entity defendants are liable because they were engaged in a
3  joint venture with NG. Moreover, the individual defendants Ricker, Porter, and Peck are
4  liable because the entities were their alter egos. Defendants do not contest NG's liability on
5  the breach of lease claim, so we only address the other defendants' liability.[10]

6  A parent corporation may be liable for its subsidiary if the parties agree to form a joint
7  venture "to pursue a particular enterprise in the hope of sharing profit." Ariz. Pub. Serv. Co.
8  v. Lamb, 84 Ariz. 314, 327 P.2d 998, 1000 (1958); U-Haul Inter. Inc. v. Nat'l Union Fire Ins.
9  Co., No. CV-10-1047-PHX-SMM, 2011 WL 9111 (D. Ariz. Jan. 3, 2011). A joint venture
10 requires five specific elements: (1) a contract, (2) a common purpose, (3) a community of
11 interest, (4) an equal right of control, and (5) participation of both profits and losses. The
12 contract may be implied or inferred from the acts of the parties. Id. Where there is a
13 question as to the existence of a joint venture, each case must be resolved upon its own facts.
14 Mercer v. Vinson, 85 Ariz. 280, 286, 336 P.2d 854, 858-59 (1959).

15  Defendants argue that plaintiff cannot prove all the elements of joint venture.
16 Defendants contend that there is no evidence of any agreement, much less common control
17 or a sharing of profits or losses. Furthermore, only NG was party to the AMA. This,
18 defendants posit, should control. Plaintiff argues that we can infer an agreement and the
19 elements of joint venture from the facts. Plaintiff, however, leaves the court to sift through
20 the many supporting facts to determine whether they satisfy the elements of joint venture.

---

[10]We reject defendants' request not to consider joint venture or alter ego liability because neither theories were expressly pled in the complaint. A review of the complaint demonstrates that the underlying substance of these theories was pled. The complaint alleges most claims against "defendants" or Right Place Properties or "Red Door Group entities." Plaintiff himself crafted these group designations. This should have put defendants on notice of possible joint venture liability. Additionally, the "Parties" section of the complaint, states: "Defendants Red Door Realty, New GrayBriar, Right Place Development, Red Door and Right Place Redevelopment (collectively referred to hereinafter as the "Red Door Group") were at all times relevant to the allegations in this complaint affiliates under the common control of Defendants Kevin D. Peck, Earl Ricker, Drew Grunwald and Rob Porter." This alleges an alter ego liability theory.

Taking the facts and the evidence advanced by plaintiff, and drawing all reasonable inferences in his favor, we conclude there is sufficient evidence to support a finding of a joint venture. For example, the entities shared a common address, separated only by a wall, used common employees who maintained the same health insurance policies. Ricker and Porter were the sole officers, directors, and shareholders of Right Place Redevelopment Company (the parent company of NG) and they, along with Peck and Grunwald, were the sole officers, directors, and shareholders of Red Door Group. NG did not even maintain its own bank account. Moreover, there is evidence of co-mingling of funds, common bank accounts, and inter-company loans to fund short term operating expenses. (doc. 93 ¶¶ 300-311). These facts indicate that the entities were not separate and independent corporations, but intimately intertwined companies that worked closely together to provide real estate investment opportunities. This is enough to infer an agreement to engage in a joint venture.

As for the other elements, the companies shared a common purpose in securing investments. Red Door Group's sole function was to market and attract potential investors to purchase units in one of the shell LLCs. All the entities shared a community of interest in selling units. The final two elements are an equal right of control and a sharing in profits and losses. It is unclear under Arizona law whether these elements are required. See Finegan v. Autotransportes Tufesa S.A. de C.V., No. CV 07-693-TUC-FRZ, 2009 WL 331349 (D. Ariz. Feb. 11, 2009) (discussing relevant Arizona case law pertaining to the elements of joint venture); see also Sparks v. Republic Nat'l. Life Ins. Co., 132 Ariz. 529, 540, 647 P.2d 1127, 1138 (1982) (listing four elements but only discussing three). Nevertheless, the fact that the parent companies, Red Door Group and Right Place Redevelopment Company, shared some of the same directors and officers suggests that there may have been an equal right of control. See Finegan, 2009 WL 331349 at *8 (concluding the same). And finally, there was sharing in profits and losses because all entities were engaged in a common business venture to obtain investments in condominium complexes. Such "mutual benefit" flowing from a joint venture can replace a strict profit and loss sharing agreement. See Transport Indem. Co. v. Liberty Mut. Ins. Co., 620 F.2d 1368, 1370-72 (9th

Cir. 1980). Accordingly, summary judgment is denied as to the entities.

Plaintiff also seeks to hold defendants Ricker, Porter, Grunwald,[11] and Peck[12] liable for breach of lease on the basis of alter ego liability. To disregard the legal entity of a corporation under Arizona law, plaintiff must show that there is a unity of interest and ownership that the separate personalities of the corporation and owners cease to exist and that to observe the corporation would work an injustice. Dietal v. Day, 16 Ariz. App. 206, 208, 492 P.2d 455, 457 (Ct. App. 1972). Relevant factors include: failure to maintain corporate formalities, commingling corporate and personal finances, plaintiff's lack of knowledge about a separate corporate existence, and diversion of corporate property for personal use. Deutsch Credit Corp v. Case Power & Equip. Co., 179 Ariz. 155, 169, 876 P.2d 1190, 1195 (Ct. App. 1994).

Here, plaintiff points to many of the same facts indicating that the Right Place Property and Red Door Group entities engaged in a joint venture to demonstrate that they are alter egos of Ricker, Porter, and Peck. However, the only facts that specifically relate to the individuals are allegations that there was common ownership and that they used corporate credit cards at times. The mere fact that Ricker and Porter were the sole officers, directors and shareholders of both Right Place Redevelopment and Red Door Group does not render the entities their alter egos. Ize Nantan Bagowa, Ltd. v. Scalia, 118 Ariz. 439, 577 P.2d 725 (Ct. App. 1978); see also Chapman v. Field, 124 Ariz. 100, 102-03, 602 P.2d 481, 483-84 (1979) (stating that stock ownership by a few persons does not mean that the owners should

---

[11] We stayed all claims against defendant Grunwald after being advised that he had filed for bankruptcy (doc. 60). We ordered that the claims would be dismissed on February 11, 2011, unless we were advised that the bankruptcy stay was lifted or a request for a lifting of the stay was not ruled on by the bankruptcy court. On February 10, 2011, plaintiff notified the court that he filed a motion for stay relief to proceed with this action (doc. 67). It does not appear that the motion was ever ruled on. Because we grant summary judgment in favor of Grunwald, the stay is moot.

[12] We were also just advised that on August 8, 2011, defendant Peck filed for bankruptcy in the United States District Court for the District of Arizona (doc. 109). Because we grant summary judgment in favor of Peck, the stay is moot.

1  be personally liable). Moreover, plaintiff fails to show that the expenses the individuals
2  charged to their credit cards were not business related. Although the evidence may
3  demonstrate a relationship, it does not demonstrate that there was such a unity of ownership
4  and interest between the entities and the individuals. See Bischofshausen, et. al. v. D.W.
5  Jaquays Min. and Equip. Contractors Co., 145 Ariz. 204, 209, 700 P.2d 902, 907 (Ct. App.
6  1985) (finding no alter ego liability on similar facts). There is no evidence that the entities
7  did not follow appropriate legal formalities or that plaintiff did not know he was dealing with
8  an LLC rather than an individual. The contract clearly lists NG as a party, and plaintiff only
9  testified that he thought he was entering into a transaction with Red Door Group, not any
10 individual. We grant defendants' motion for summary judgment on plaintiff's breach of
11 contract claim as against defendants Ricker, Porter, Grunwald, and Peck.

**E. RICO**

Plaintiff's final cause of action alleges violations of 18 U.S.C. §§1962(a) and (d) of the Racketeer Influenced and Corrupt Organizations Act. Defendants move for summary judgment on the basis that plaintiff fails to produce any evidence of a pattern of racketeering activity or causation. Plaintiff's sole response is to point to the AMAs of other investors as evidence of a pattern. Plaintiff does not respond to defendants' arguments that the real estate sales did not involve RICO predicate acts and there is no proof of causation.

A violation of § 1962(a) occurs when a person utilizes an enterprise to launder money generated by a pattern of racketeering. A "pattern of racketeering" is two acts of racketeering activity within ten years of each other. 18 U.S.C. § 1951(5). There must be a "showing of a relationship between the predicates and the threat of continuing activity." Id. Continuity may be demonstrated by "a series of related predicates extending over a substantial period of time," or "past conduct that by its nature projects into the future with a threat of repetition." Howard v. Am. Online, Inc., 208 F.3d 741, 751 (9th Cir. 2000).

Plaintiff's RICO claim fails as a matter of law. First, the complaint does not identify a predicate act. Having found that defendants did not commit any violations of federal or state securities laws or engage in any fraudulent behavior, there is no evidence of any

underlying predicate acts of racketeering. See § 1961(1). The sale of real property is not criminal, let alone a RICO predicate act. See Wiltshire v. Dhanraj, 421 F. Supp. 2d 544, 551 (E.D.N.Y. 2005) (finding that plaintiff failed to allege anything about the homes sales that would meet the definition of "racketeering activity"). Evidence that other investors entered into similar AMAs with defendants does not prove defendants engaged in any predicate acts, much less establish a pattern. Further, there can be no threat of continuing activity because the corporate entities went out of business in early 2009 (doc. 85 ¶ 213). Plaintiff's conclusory allegations of continuity are insufficient as a matter of law. We also agree with defendants that there are no facts supporting the causation element of a § 1962(a) claim. Plaintiff has not alleged that defendants invested income in a separate enterprise. See Sybersound Records, Inc. v. UAV Corp., 517 F.3d 1137, 1149 (9th Cir. 2008) (stating that reinvestment of proceeds from alleged racketeering activity back into the same enterprise is insufficient to show proximate cause). Absent a showing of a substantive violation of RICO as a matter of law, there can be no RICO conspiracy claim. Howard, 208 F.3d at 746. We grant defendants' motion for summary judgment on plaintiff's RICO claims.

### III. Conclusion

Accordingly, **IT IS ORDERED GRANTING in part and DENYING in part** plaintiff's motion for partial summary judgment (doc. 77). We DENY the motion, except as to New Graybriar's liability on the breach of lease claim, since New Graybriar admits that it is in breach. **IT IS FURTHER ORDERED GRANTING in part and DENYING in part** defendants' motion for summary judgment (doc. 84). All the claims are dismissed as against all defendants except count 6 for breach of lease against defendants New Graybriar, Red Door Group, Right Place Redevelopment Company, Right Place Asset Management Company, and Red Door Realty.

DATED this 10th day of August, 2011.

_Frederick J. Martone_
Frederick J. Martone
United States District Judge

- 15 -